UNITED STATES DISTRICT COURT
SOUTHERN DISSTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :

UNITED STATES OF AMERICA,          :

                                             :

      - v. -                         :       09 Cr. 902 (SHS)

                                             :

HASSAN NEMAZEE,               :

                                           :

                     Defendant.      :

                                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO HASSAN NEMAZEE'S MOTION FOR A HEARING AND TO MODIFY CONDITIONS OF SUPERVISED RELEASE

AUDREY STRAUSS
United States Attorney
Southern District of New York

Michael D. Lockard
Assistant United States Attorney
    - Of Counsel -

## TABLE OF CONTENTS

Background ................................................................................................................. 2

    A.  Nemazee's Offense Conduct ............................................................... 2

    B.  Nemazee's Sentencing, Forfeiture, and Restitution ......................... 4

    C.  Nemazee's Supervised Release and Travel Requests ...................... 6

    D.  Nemazee's Payment of Restitution While on Supervised Release ........................... 10

    E.  Nemazee's Motion To Modify His Conditions of Supervision
        And For A Hearing ...................................................................... 11

Discussion ............................................................................................................ 11

Conclusion ........................................................................................................... 17

i

The Government respectfully submits this memorandum of law in opposition to the motion by supervisee Hassan Nemazee for a hearing pursuant to 18 U.S.C. § 3583(e) and to modify his conditions of supervision.

Nemazee complains that his requests for international travel have been denied by the United States Probation Office ("USPO")—and by the Court—and that his supervision is treated as "intense supervision." The motion be denied. Whatever label is attached to Nemazee's supervision, the level of his supervision clearly is reasonable in light of (1) the nature of his underlying offenses: a $292 million bank fraud and identity theft scheme that lasted for at least 12 years; (2) his enormous outstanding forfeiture and restitution obligations, which total at least $180 million; and (3) the fact that he is currently employed as an investment advisor and has a less-than-arm's length relationship with his employer. Under these circumstances, the restrictions Nemazee has faced while on supervision have been quite light: he has been denied permission to travel to Costa Rica, in the midst of a global pandemic where international travel is highly inadvisable. In contrast to that denial, all of Nemazee's requests for domestic travel have been approved, and the Government understands that Nemazee in fact has repeatedly travelled or made plans to travel to Florida, Utah, Arizona, Minnesota, and possibly elsewhere. Nemazee's motion, far from demonstrating that the Probation Office has acted unreasonably or arbitrarily, demonstrates that Nemazee has been given great leeway for travel. It appears that Nemazee's demands are unreasonable, not Probation's review of his requests.

Moreover, as discussed in more detail below, the Government has serious concerns about Nemazee's compliance with his forfeiture and restitution obligations. Though Nemazee has made payments of 15% of his monthly salary towards restitution, it also appears that Nemazee receives substantial additional, non-salary, compensation from his employer and romantic

partner, including free company housing on Central Park and free luxury travel, that greatly increase the funds available for his personal use but are not accounted for in his restitution payments. Indeed, while on supervision, Nemazee has made large cash gifts to family members that exceed his total restitution payments.

## BACKGROUND

### A.     Nemazee's Offense Conduct

Nemazee is currently on supervised release following his conviction for bank fraud and identity theft. Nemazee began committing bank fraud as early as 1997, though he was using fabricated and forged financial records even before his first known bank fraud for purposes known and unknown. (*See* Govt. Sent. Ltr. at 10-11, 19). It appears that Nemazee began committing fraud in order to cover bad investments: when a real estate investment went bad in the early 1990s and he was unable to continue paying loan interest on the property, Nemazee claimed fictional investment portfolios to induce NationsBank to issue large bank loans he could use to cover the financial hole. (PSR ¶¶ 49-50). From that point forward, Nemazee had essentially no legitimate income: *all* of his income was derived, either directly or indirectly, from fraudulently obtained bank loans. As time went on, Nemazee borrowed ever larger amounts of money to cover investment losses,[1] fund a lavish lifestyle, buy residences in Manhattan and Europe, and service the fraudulently obtained loans. (*See* Govt. Sent. Ltr. at 7, 13-15). His bank fraud became a Ponzi scheme, where he had to continually defraud banks in order to make partial payments to his victims and keep the scheme going.

---

[1] To the extent that any investments Nemazee made with his stolen funds had positive returns, those investments were chosen and managed by others, not by Nemazee. (Govt. Sent. Ltr. 13).

Nemazee used increasingly brazen and sophisticated methods of deception to defraud large, sophisticated institutional lenders, including Citibank, Bank of America, and HSBC Bank. Nemazee routinely created false financial records that purported to show millions or hundreds of millions of dollars' worth of securities holdings in order to induce banks to open lines of credit or to increase his borrowing limits. (*See* PSR ¶¶ 16-35; Govt. Sent. Ltr. at 3-7). Over time, Nemazee began appropriating personal identifying information and forging the signatures of financial professionals in order to bolster the credibility of these forged documents, and leased two virtual offices and phone services in the names of investment advisory firms in order to backstop any due diligence inquiries from lenders about his fictitious investment portfolios. (*Id*. at 4-6).

Nemazee abused family and personal relationships as part of his crimes. For years, Nemazee turned to his brother-in-law, Shahin Kashanchi, to digitally manufacture numerous fraudulent account statements. (*See* PSR ¶¶ 11, 19, 23, 29, 31-32, 35; Govt. Sent. Ltr. at 2-3). Nemazee defrauded a longtime friend and business partner into pledging collateral and for, and personally guaranteeing, a fraudulently obtained line of credit, and then made millions of dollars' of withdrawals on this line of credit without the knowledge or authorization of his partner. (*See* PSR ¶¶ 16(f), 43-46; Govt. Sent. Ltr. at 13-14). Nemazee also deceived his wife, surreptitiously removing her name from their multi-million-dollar Park Avenue apartment; as well as his cooperative board, concealing that he borrowed several million dollars against the apartment in violation of a no-financing provision.

By 2009, the total amount of Nemazee's fraud had grown to a staggering sum of over $217 million, with more than $142 million in fraudulent loans from Bank of America and nearly $75 million in fraudulent loans from Citibank. (PSR ¶¶ 38, 42; Govt. Sent. Ltr. at 1). Nemazee

3

also opened a fraudulent line of credit with HSBC. Nemazee used these hundreds of millions of dollars to buy luxury Tribeca apartments for his children, a Rome apartment and 100-acre estate in Italy, a luxury yacht, and an interest in a private jet; he also used the stolen funds to pay millions of dollars in mortgage interest, taxes, and maintenance payments on his 12-acre country estate in Katonah and his 6-bedroom duplex apartment on Park Avenue; and nearly $2 million in political and charitable donations, which he used to purchase political influence and social status and to bolster his appearance of creditworthiness with the victim banks; among other things. Over the course of the approximately 12-year fraud, Nemazee repeatedly transferred funds overseas, including to Italy, Switzerland, the United Kingdom, Bermuda, Iceland, and elsewhere.

In the summer of 2009, Citibank began probing more deeply into Nemazee's financial condition, concerned about Nemazee's creditworthiness and the bank's level of exposure. Nemazee attempted to avoid Citibank detecting the scheme by stealing from Peter to pay Paul: he drew down $75 million from HSBC, which he transferred to his accounts at JPMorgan Chase Bank, in order to pay down his Citibank loans without alerting Citibank to the source of funds. (PSR ¶¶ 26-34, 41; Govt. Sent. Ltr. at 4-5, 6, 9). JPMorgan Chase Bank froze the funds based on concern about their illegal source. Nemazee's total fraud amount thus reached more than $292 million.

## B.     Nemazee's Sentencing, Forfeiture, and Restitution

On March 18, 2010, Nemazee pleaded guilty to a four-count superseding information charging him with committing bank fraud from approximately 1997 through 2009 against Bank of America; committing bank fraud from approximately 2005 through 2009 against Citibank; committing bank from in 2009 against HSBC; and committing wire fraud from approximately 2008 through 2009 against his business partner. That same day, the Court entered a preliminary order of forfeiture directing that Nemazee pay a forfeiture money judgment in the amount of

4

$292.241 million, including forfeiting all of his interests in a lengthy list of properties, accounts, and investments. (D.E. 29) ("Preliminary Forfeiture Order").

On July 15, 2010, the Court sentenced Nemazee principally to a term of imprisonment of 144 months, to be followed by a term of supervised release of three years, and restitution in the total amount of $292,333,052. (D.E. 66, 78). Nemazee is required to pay 15% of his "gross monthly earnings" towards his restitution obligation. (*Id*.).

Prior to and after sentencing, the Government embarked on an intensive asset forfeiture analysis and recovery effort. That effort relied in part on record obtained in connection with the underlying criminal investigation, including voluminous paper records seized from Nemazee's offices, as well as dozens of subpoenas, interviews, depositions, and forensic analysis. Nemazee was interviewed at length and deposed as part of that recovery effort. The Government found, however, that Nemazee's ability to recall and usefully explain his investments, financial activities, and funds flows was limited, despite having access to many of the same records as the Government through criminal discovery. The Government's recovery efforts ultimately relied on its own independent investigation and analysis. (*See, e.g.*, Govt. Sent. Ltr. at 18 ("the defendant was unable to provide a substantially detailed accounting of the assets purchased by him with the proceeds of his fraud"), 20 (Nemazee's "information was of limited utility. The defendant did not identify assets previously unknown or that the Government was not already in the process of recovering. Nor did he clarify or identify transactions of which the Government was unaware").

The Government's effort has resulted in the forfeiture of approximately $112 million in assets, including more than approximately $722,166 returned by political and charitable recipients (D.E> 65); which have been applied to restitution. Nemazee's presently outstanding forfeiture obligation stands at approximately $180,821,846.32. That unrecovered forfeiture

amount largely reflects the degree to which Nemazee dissipated the proceeds of his fraud through his and his family's luxury lifestyle, impaired the value of his assets by borrowing against them, and squandered the funds on failed investments.

**C.     Nemazee's Supervised Release and Travel Requests**

Nemazee commenced supervision in approximately November 2019. His supervision is currently scheduled to expire in November 2022.

Prior to beginning his supervised release, Nemazee began petitioning the Court for permission to travel extensively, including international travel, based on his prospective employment with Merilane Management and The Araz Group. In his initial letter to the Court on September 20, 2019, and in several letters to the Court thereafter, Nemazee repeatedly represented that his ability to secure and maintain his employment depended on his ability to travel. For example:

> Beginning shortly after his release to home confinement pursuant to the First Step Act, Mr. Nemazee has worked as a senior advisor to the Chairman at Merilane Management and The Araz Group, d/b/a HealthEZ, a health care and real estate company that has been in business for over 37 years. Mr. Nemazee has been offered a full time position, which includes significant, graduated pay increases from his current $15 per hour to $30 per hour when he begins training and then to $60 per hour when he completes training. . . Mr. Nemazee's offer of employment is entirely contingent on his ability to attend training sessions in Minnesota and to travel to on-site real estate projects both domestically and internationally. In short, without the ability to travel, Mr. Nemazee will lose this stellar job opportunity.

(D.E. 151). On October 10, 2019, Nemazee again wrote to the Court about this "very promising job offer with Merilane Management and the Araz Group, d/b/a HealthEZ. . . . However, Mr. Nemazee's job offer is contingent upon his ability to travel domestically and internationally." (D.E. 152).

The Chairman of Merilane Management is Nazie Eftekhari. As described below, Nemazee acknowledges that Ms. Eftekhari is and has been his girlfriend (D.E. 163-1 at 5), though that relationship was not described in his initial letters to the Court about the nature of his employer and his employment, describing his job requirements, describing the nature of his employment compensation, or requesting travel permission and describing the purported employment consequences if Nemazee is unable to travel. Nemazee argues that he disclosed the nature of his relationship to Probation after he started supervised release, but does not explain his failure to disclose it earlier or why he made incomplete representations to the Court.

Throughout his supervised release, Nemazee has repeatedly sought, and been given permission, to travel domestically for work. In fact, the Government has been advised that Nemazee has never been refused a request to travel domestically for work purposes.[2]  Nemazee has travelled by commercial airline, company jet, and private charter jet; his accommodations have included the L'Auberge de Sedona in Sedona, Arizona, "one of the Southwest's foremost luxury retreats exuding complete tranquility, refinement, and romance" (*see* https://www.lauberge.com/resort/); the Amangiri resort in Canyon Point, Utah, a "600-acre sanctuary of wilderness and isolation in Canyon Point, Southern Utah" providing "Ultimate personalisation of bespoke adventures and cultural activities," with a "destination spa" (*see* https://www.aman.com/resorts/amangiri); and the Surf Club in Miami Beach, Florida, "an oceanfront destination bringing a new era of glamour elevated with chic Italian dining and a world-class spa." (*See* https://www.fourseasons.com/surfside/). The Government is unaware of

---

[2] The Government has had an opportunity to review some of Nemazee's travel requests in connection with responding to the Motion. They are typically vague about the purpose of the travel and business itinerary, and provide no information about whether others from the company are travelling and, if so, who.

what rates Nemazee's employer paid for these accommodations, but it appears that rates at these resorts typically begin near or above $1,000 per night and can range up to several thousand dollars per night.

In early 2020, Nemazee sought permission to travel to Costa Rica "for him to supervise the completion of a real estate project for his employer and to explore other real estate investment opportunities." (D.E. 154). The Court granted the request. However, because of the emergence of the global COVID-19 pandemic, international travel was disrupted and travel to Costa Rica was impossible. Nemazee then requested that his conditions of supervision be modified to permit the Probation Office to approve international travel, in particular to Costa Rica in order to "continue to supervise the real estate projects for his employer and to explore other real estate investment opportunities," without Court intervention. (D.E. 156). The Court granted the request.

The Government has been advised by the Probation Office that Nemazee did not travel to Costa Rica, but instead travelled to St. Barthelemy (St. Barts) in the Caribbean for approximately 19 days in August 2020 "to explore various prospects that have risen due to the economic downturn." The travel itinerary provided to Probation showed that Nemazee would be staying at the Villa Agapi, which the Government understands to be a "3 bedroom [villa] designed to deliver a Dream Vacation with ambiance and comfort." (*See* https://www.stbarth.com/villas/detail/agapi/agapi). Weekly rates at this resort for 2021 appear to be approximately $4,000. (*Id.*). At the time Nemazee's travel to St. Barts was requested, he had no meetings yet scheduled and the travel request indicated that meetings would be arranged.

In approximately October 2020, Nemazee again sought permission to travel to Costa Rica, this time for a two-month period over the holidays, from mid-November to mid-January.

Nemazee's proposed travel was by private jet[3] (D.E. 158-2); his prior proposed trips to Costa Rica included accommodations at the Villa Eram, which the Government understands to be a 5-bedroom "luxury vacation rental" villa with "a 2 story tall green wall, water features inside and outside, fully equipped open kitchen, formal dining area with seating for ten, lounge area featuring a grand piano sitting on water, and a recreation room, and fitness studio." (*See* https://www.exceptionalvillas.com/villa-eram/). Rates at the Villa Eram appear to range in the thousands of dollars per might. (*Id.*).

Probation denied the travel request and Nemazee asked the Court to overrule this denial. (D.E. 158). Nemazee claimed that the "trip to Costa Rica is a necessary component of his job duties," that "Mr. Nemazee's role simply cannot be done remotely," and that "if Mr. Nemazee cannot make this trip, Merilane will have to quickly find a qualified individual with Mr. Nemazee's level of expertise who can take his place. Similarly, if Mr. Nemazee cannot travel, he will be unable to perform his basic job functions and runs the risk of a temporary, or even permanent, layoff." (D.E. 158-1). In his letter to the Court, Nemazee acknowledged that he has a "personal relationship" with his employer, but argued that "it is still a job. He earns a salary based on his ability to travel to supervise the construction projects of his employer. . . [T]his job enables him to make monthly restitution payments. If he can't do his job, his employer will find someone else to do it, jeopardizing his income and the restitution payments." (D.E. 158).

The Court denied Nemazee's request. (D.E. 159). Nemazee then moved to terminate his supervision. (D.E. 160, 161). In support of the motion, Nemazee attached letters of support dated October 2020, suggesting that the request was being prepared before he asked the Court for

---

[3] The travel by private jet was justified to "minimize costs and ensure safety," and the need to transport "specialty AV equipment" to Costa Rica.

permission to travel to Costa Rica. (*Id*. Exs. B, C, D). Nemazee obliquely stated that "this job was obtained through Mr. Nemazee's personal contacts and friends," and argued that "[h]is employment and ability to make restitution payments is now threatened by his inability to do his job because of travel restrictions." (*Id*.). Shortly after filing his termination request, Nemazee also amended his request for permission to travel to Costa Rica, seeking four weeks' travel instead of eight. As he acknowledged in a letter to the Court, his prior itinerary included meetings that were "not deemed essential" and which could be deferred, and that other meetings could be "compressed." (D.E. 161).

Probation denied the amended request (*id*.) and the Court denied the requests for early termination and for international travel permission. (D.E. 162). After Probation denied Nemazee's request for extended travel to Costa Rica, Nemazee and his counsel asked that an in-person meeting with Probation be conducted remotely in light of the risks of COVID.

**D.     Nemazee's Payment of Restitution While on Supervised Release**

According to information provided by the Probation Office, while on supervised release Nemazee has paid a total of $29,250 in restitution to date.

Probation also reports that Nemazee has disclosed that in late 2020, he made cash gifts to his children totaling approximately $45,000.

The Government has also been advised by Probation that Nemazee has disclosed that his residence, a Fifth Avenue apartment on Central Park, is leased by Merilane Investments and he resides there rent-free. The Government is unaware if Nemazee has received other funds from, or had other expenses paid by, Merilane or by Ms. Eftekhari. Nemazee's significant travel expenses have been paid by his employer, including private jet travel and resort accommodations.

E.       **Nemazee's Motion To Modify His Conditions of Supervision And For A Hearing**

On February 1, 2021, Nemazee filed another motion to modify his conditions of supervision to remove any restrictions on travel, including international travel, for business purposes, or in the alternative to terminate. (D.E. 163) ("Motion"). Nemazee argues that his conditions of supervision, in particular his inability to travel internationally, are punitive rather than rehabilitative. (Mot. at 22-23). He argues that he poses no risk of recidivism and that deterrence from further crimes cannot be a basis for any of his conditions of supervision. (*Id*.). He also argues that the proposed modification would promote victim recovery because he will earn more if able to travel freely. (*Id.* at 23-24).

## DISCUSSION

Nemazee's request to modify his conditions of supervision and for a hearing should be denied. As an initial matter, Nemazee has not identified why a hearing is necessary or what evidence he hopes to have the Court consider at a hearing. Nemazee appears already to have provided the Court with all of the evidence and information that he wishes to be considered. Accordingly, an evidentiary hearing is not warranted. A hearing also is not required should the Court deny the motion to modify—a hearing is required only prior to modifying. *See, e.g.*, *United States v. Parisi*, 821 F.3d 343, 349 (2d Cir. 2016). To the extent the Court would find a conference with the parties and with Probation to address Nemazee's motion and his compliance with supervision useful, the Government has no objection and believes that, to the extent a hearing is required, such a conference where would satisfy the requirement. *Id*.

Nemazee's motion should also be denied to the extent that he merely seeks to reargue or have the Court reconsider his prior motions. "To succeed on a motion for reconsideration, the movant carries a heavy burden. The movant must show 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest

11

injustice.' 'The decision to grant or deny a motion for reconsideration rests within the sound discretion of the district court.'" *In re Taneja*, 17 Civ. 9429 (JGK), 2019 WL 1949839, at *1 (S.D.N.Y. Apr. 19, 2019) (quoting *Doe v. N.Y.C. Dept. Soc. Servs.*, 709 F. 2d 782, 789 (2d Cir. 1983), and *Vincent v. Money Store*, 03 Civ. 2876, 2014 WL 1673375, at *1 (S.D.N.Y. Apr. 28, 2014)). Nemazee has not cited any new law, offered new evidence, or advanced new arguments in the Motion. The Court accordingly should deny the Motion as an exercise of its discretion.

Nemazee's Motion should also be denied on the merits. Far from showing that modification or termination are appropriate, Nemazee's current conditions, including restrictions on international travel, are wholly appropriate in light of (a) the nature and circumstances of his offenses; (b) the similarities between the nature of his current employment and his prior activities when he was committing the offenses; (c) the nature of his relationship with his employer; and (d) his apparent non-salary benefits and compensation that have not been reflected in his restitution payments.

With respect to the nature and circumstances of his offense, Nemazee argues that they are irrelevant because supervised release is intended to be rehabilitative rather than punitive. (Mot. at 22-23). The Second Circuit has directed district courts, in considering conditions of supervision, to consider "general punishment issues, such as deterrence, public safety, rehabilitation, proportionality, and consistency." *United States v. Lussier*, 104 F.3d 32, 35 (2d Cir. 1997). But Nemazee's conditions of supervision are not punitive in any event. Indeed, the restrictions have been quite light in view of all of the relevant circumstances, and it appears that more restrictive financial and reporting conditions may even be appropriate. As is relevant here, Nemazee is required to seek permission for travel, which is a routine requirement for supervisees and one that facilitates supervision. A supervisee who travels without advance notice or permission from

Probation can easily engage in activities that Probation is unaware of and unable to monitor, which frustrates supervision and creates opportunities to violate the conditions. Here, that requirement has had relatively minor impact on Nemazee: he has repeatedly requested domestic travel permission, and has uniformly been granted permission. In fourteen months of supervision, Nemazee has travelled or made plans to travel to Utah, Arizona, Minnesota, and Florida, at the very least.  Only his requests for international travel have been denied.

The nature and circumstances of Nemazee's offense are relevant to his supervision in other ways, as well. Nemazee committed his offense while nominally in the role of an investment professional. Though Nemazee's actual business activity consisted primarily of committing, and spending the proceeds of, bank fraud, he was a partner in an investment firm along with a friend and business associate.  That friend and business associate was also a victim of Nemazee's fraud. (*Supra* at 3). The fact that Nemazee's current employment is as an advisor on investment matters[4] is a factor that warrants appropriate attention by Probation to be aware of and able to supervise Nemazee's activities.

Probation and the Court's denial of Nemazee's international travel requests are reasonable and, the Government concurs, appropriate. Unlike with domestic travel, where the Probation Office in the district of travel is available for supervision duties, with international travel supervision is impossible. Nemazee's proposed international trips frequent and lengthy, and could result in his spending significant periods of time outside the country. This defeats effective supervision. Moreover, international travel presently is strongly discouraged for *all*

---

[4] Nemazee does not have, to the Government's knowledge, any relevant experience in developing high-end residential real estate as investment properties. As described above, Nemazee's lengthy career as a fraudster began in the wake of a failed commercial real estate investment that drained his personal assets.

travelers: the Centers for Disease Control and Prevention ("CDC") currently rates Costa Rica as a "Level 4 Risk," meaning the risk of COVID-19 exposure is "Very High" and "Travelers should avoid all travel to Costa Rica." *See* CDC, *COVID-19 in Costa Rica* (Feb. 2, 2021), *available at* https://wwwnc.cdc.gov/travel/notices/covid-4/coronavirus-costa-rica. Nemazee's insistence on international travel during a pandemic, moreover, is in contrast with his reluctance to attend in-person meetings with his supervising probation officer.

The nature of Nemazee's offenses also warrant enhanced scrutiny of proposed international travel. In the 12-year course of committing nearly $300 million in bank fraud, Nemazee acquired substantial assets overseas, maintained bank accounts overseas, and transferred stolen funds overseas.  He transferred funds to, among other places, Italy, Switzerland, the United Kingdom, Bermuda, and Iceland.  He maintained residences in Italy. He has family members that reside abroad.  The Government's asset forfeiture investigation sought to trace and recover all possible funds, but it is impossible to know with certainty whether overseas assets or accounts remain. And even if all overseas accounts and assets have been accounted for, the defendant's history of transferring stolen funds overseas and maintaining properties overseas acquired with stolen funds militates strongly against overseas travel while he is on supervised release.

In his motion, Nemazee accuses Probation of being "obsessed with," or "demeaning and belittling" towards Ms. Eftekhari and claims that Ms. Eftekhari believes her support for Mr. Nemazee is being denigrated because of her sex and race. (Mot. at 5). The Government has not been a party to any of these conversations and is unable to comment upon them, but certainly in the Government's interactions with Probation, that conduct has not occurred and no such sentiments have been expressed. Contrary to Nemazee's assertions, the fact that he has both a

14

personal and an employment relationship with Ms. Eftekhari is highly relevant to Probation's

and the Court's evaluation of his international travel requests. To be clear, there certainly is

nothing inherently improper, inappropriate, or illicit about that relationship, so long as it

complies with any applicable corporate policies and so long as decisions regarding Nemazee's

employment are consistent with any applicable duties to the company and to its investors. The

Government has no information about those matters and expresses no opinion about them.

However, in the relevant context of supervised release, where Nemazee is subject to reasonable

supervision conditions, where his employment is the justification for repeated requests for

lengthy international trips on private jets at luxury resorts, and where his restitution payments

depend on the compensation structure set by him and his employer, it is manifestly reasonable

for Probation and the Court to scrutinize those requests more carefully.[5] Indeed, it would be

irresponsible not to.

       Because Nemazee has both a romantic and an employment relationship with Ms.

Eftekhari, is also difficult to discern whether claims about the necessity of Nemazee's presence

on international trips reflects a business judgment or reflects the nature of his personal

relationship with his employer.[6] For example, Nemazee has made other assertions about what

would happen to his employment if he could not travel internationally, which so far have not

materialized. In his request to this Court for permission to travel to Costa Rica for two months

over the holidays, Nemazee initially argued that his in-person travel to Costa Rica for two

---

[5] As described above, the Government concurs that international travel is unwarranted in any event.

[6] In a letter to the Court, Merilane's Senior Vice President for Operations states that she is Nemazee's direct supervisor. (D.E. 160 Ex. B). However, Nemazee has made it clear that he was hired by Ms. Eftekhari, his employment services are provided to her, and she appears to be the decision maker with respect to his employment and compensation, subject to any influence Nemazee may have on those matters.

months was essential. Later, he conceded that he could, at the very least, reduce the trip by four weeks. Similarly, Nemazee has argued that he risks being temporarily or permanently laid off if he could not take the trip. So far, it does not appear that he will be.

In light of all of these factors, including the nature of Nemazee's underlying offenses and the inability of Probation to effectively supervise Nemazee while he is overseas, Probation and the Court's denials of Nemazee's international travel requests are reasonable and the proposed modification should be rejected.

Finally, the Government respectfully suggests that Nemazee's restitution obligations warrant further review. As described above, Nemazee has paid a total of approximately $29,250 in restitution, based on 15% of his nominal salary. Nemazee's total compensation, however, appears to significantly exceed his salary: he lives rent-free in a company apartment on Central Park; he travels extensively at company expense, including by private charter and corporate jet, and registers extended stays at luxury resorts where even a single night's accommodation can easily exceed his monthly restitution payment. The Government does not know if Nemazee receives other funds or benefits from, or has other expenses paid by, Merilane or by Ms. Eftekhari. Whatever Nemazee's true financial picture is, it is sufficiently comfortable to have allowed him to make cash gifts to his children totaling approximately $45,000, far exceeding his restitution payments. Under these circumstances, it is unclear whether Nemazee is complying with his obligation to pay 15% of his "gross monthly earnings" or, in the alternative, whether that restitution obligation is consistent with the realities of his financial circumstances, his access to funds, and his lack of living expenses. A more comprehensive review of Nemazee's financial condition and sources of support is warranted.

16

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the

Motion.

Dated:  New York, New York
        February 5, 2021

                                    Respectfully submitted,

                                    AUDREY STRAUSS
                                    United States Attorney
                                    Southern District of New York

                          By: _____
                                    Michael D. Lockard
                                    Assistant United States Attorney

Cc:     Counsel of record (ECF)
        Officer Godwin Ogunmefun, U.S. Probation Office, SDNY (by email)